# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-319 (CRC)** |
| **v.** | : | |
| | : | |
| **RANDY VERDUN Sr.,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Randy Verdun Sr. has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Verdun to 21 days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, a fine the Court deems appropriate, and, consistent with the plea agreement in this case, $500 in restitution.

## I.    Introduction

Verdun, a 65-year-old pipe designer, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Verdun pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by Verdun's repeated efforts to enter the Capitol building despite the clear warning signs that he was not permitted to be there. After Verdun entered the Capitol through the Senate Wing Door, police officers successfully expelled Verdun from the Capitol through a shattered window along the Senate Wing. Despite this, several minutes later, Verdun entered the Capitol a second time through a fire door adjacent to the Parliamentarian's office. He did so after observing the continued chaos and violence on the Upper West Terrace. He only left the Capitol after his second entry because police pushed him, and other rioters, out of the Capitol at this location.

The Court must also consider that Verdun's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Verdun's crime support a sentence of Verdun to 21 days' incarceration on Count One and 36 months' probation on Count Two.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**Factual and Procedural Background**

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20.

*Verdun's Role in the January 6, 2021, Attack on the Capitol*

Verdun traveled from his residence in Denham Springs, Louisiana to Washington D.C. to participate in events scheduled in Washington D.C. on January 6, 2021. On January 6, Verdun attended the former President's "Stop the Steal" rally, where he wore a red beanie under a distinct camouflage baseball cap with an American flag bill, a black leather jacket, and a black and gray Swiss Army backpack. (*Image 1*).



*Image 1: Verdun near the National Mall on January 6, 2021.*

Following the rally, Verdun traveled with the crowd to the Capitol. Once he arrived at the Capitol, Verdun observed altercations between rioters and police officers as police officers attempted to prevent the mob from advancing on the Capitol. Nonetheless, Verdun proceeded deeper on Capitol grounds, eventually reaching the Capitol's Upper West Terrace, where rioters had violently breached the Senate Wing Doors roughly ten minutes earlier. As the mob

overwhelmed the vastly outnumbered police officers on the Upper West Terrace, rioters gathered in the Northwest Courtyard and along the Senate Wing. Many of the rioters on the Upper West Terrace, including Verdun, used this opportunity to enter the building. Verdun entered the Capitol through the Senate Wing Doors at approximately 2:25 p.m. (*Image 2*). As he entered, the sounds of the alarm blared overhead.



*Image 2: Verdun – circled in yellow – entering the Capitol.*

Once inside the Capitol, Verdun turned right and walked with other rioters to the Capitol Crypt, where he remained for approximately five minutes. Then, Verdun returned to the Senate Wing Corridor as police officers attempted to expel Verdun and others out of the Capitol. (*Image 3*). Verdun spent several minutes at this location and observed the seriousness of the situation as the presence of officers outfitted in riot gear increased. Many of those officers surrounded Verdun and other rioters as they funneled rioters out of the building. At this time, Verdun also observed officers barricading an adjoining door to prevent rioters from entering the Capitol. These officers eventually forced Verdun to exit the Capitol at 2:35 p.m. through a broken window roughly 10 minutes after he first entered.



*Image 3: Police officers funneling Verdun and other rioters out of the Capitol as officers attempted to barricade an adjoining door.*

Despite these cues and the ensuing chaos, Verdun did not leave the Capitol grounds. Instead, Verdun remained on the Upper West Terrace as rioters violently breached a fire door adjacent to the Parliamentarian's office at 2:42 p.m., approximately 7 minutes after his initial exit from the Capitol. Verdun entered the Capitol a second time through the Parliamentarian Door at approximately 2:58 p.m. *(Image 4)*. Once again, Verdun could hear the sounds of an alarm blaring as he passed through the breached door.



*Image 4: Verdun entering the Capitol for the second time.*

Verdun remained in the Capitol for several minutes and he recorded the actions of other rioters on his phone. At approximately 3:00 p.m., officers began removing these individuals, including Verdun, from the Capitol by forcefully pushing the mob through the Brumidi Corridor – out the fire doors – to the Upper West Terrace. (*Image 5*). Shortly thereafter, Verdun left the Capitol, as police officers were attempting to clear the Capitol.



*Image 5: Verdun was pushed out with the tightly packed mob as officers physically removed rioters from the Brumidi Corridor.*

*Verdun's Interview*

The FBI interviewed Verdun on April 18, 2024, where he attempted to rationalize his movements and offered vague portrayals of his actions. Verdun acknowledged traveling to Washington, D.C., where he attended the former president's rally to be part of "an important part of history." After the rally, Verdun "walked around" where he observed, "individuals having altercations with police and saw the police pushing back the crowd."

Aside from conceding that he "walked around the interior of the Capitol and took videos for 15 minutes" and observed "confrontations," Verdun refused to address his movements or observations at the Capitol with additional specificity or explain why he entered a second time. While offering a broad overview of his actions, Verdun attempted to excuse his movements by

stating that he, "was just following the large group of people at the rally and followed the crowd that entered inside the Capitol." Verdun sought to paint himself as someone who naively, "followed others as the rally participants moved to the Capitol building but [he] had no prior knowledge of, or intent, to break into the building." Verdun stated he left the Capitol and traveled back to his hotel when, "[T]hings began to get bad." Notably, he did not explain why he was undeterred by the violence he observed after he arrived on Capitol grounds, nor why he only left after officers twice removed him from the building.

Equally concerning was Verdun's representation during the interview that, "[T]he police allowed Verdun and others to walk around inside the Capitol but said they could not go inside the bathroom." CCTV footage at the Senate Wing Door showed that Verdun flooded into the Capitol with other rioters and did not interact with police officers. When he returned to the Senate Wing, police officers in riot gear confronted Verdun and removed him from the Capitol. Any representation that officers permitted his presence inside the building is disingenuous. At the end of his interview, Verdun acknowledged that he, "should not have went in if he knew what was going to happen as it was supposed to be a peaceful event" and he "did not have any intent to do anything wrong and just wanted to attend the rally." But this explanation failed to account for his observations on Capitol grounds or explain why he entered the Capitol a second time.

*The Charges and Plea Agreement*

On July 11, 2024, the United States charged Verdun by a two-count Information with violating 40 U.S.C. § (e)(2)(D) and (G). On August 13, 2024, pursuant to a plea agreement, Verdun pleaded guilty to both Counts of the Information. By plea agreement, Verdun agreed to pay $500 in restitution to the Architect of the Capitol.

## II.    Statutory Penalties

Verdun now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Verdun faces up to six months of imprisonment and a fine of up to $5,000. Verdun must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As the offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration on Count One and 36 months' probation on Count Two.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Verdun's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Verdun, the absence of violent or destructive acts is not a mitigating factor. Had Verdun engaged in such conduct, he would have faced additional criminal charges.

8

The most important factor in Verdun's case is his decision to enter the Capitol a second time after officers clearly directed him to leave. This decision disrupted officers' continued efforts to restore order on the Upper West Terrace. Verdun knew, based on what he saw, that the mob had overwhelmed police, and he had no authority to enter the Capitol. Nonetheless, when Verdun entered the Capitol for the first time he moved to the Crypt. After returning to the Senate Wing, police officers in riot gear surrounded him as they attempted to expel rioters from the building, including Verdun. The circumstances of Verdun's initial departure were clear; he was not permitted to remain or enter the building. Yet, despite the violence, the overwhelmed police, the alarms, the destruction along the senate wing, and the general chaos on the Upper West Terrace after he departed the building, Verdun approached and entered an adjacent entryway that rioters violently breached roughly seven minutes after officers initially removed Verdun from the Capitol. Verdun only left the Capitol a second time after officers physically pushed Verdun, and other members of the mob, out the fire doors and onto the Upper West Terrace. Verdun had ample opportunity to observe the violence after he arrived on Capitol grounds and leave. Verdun did not leave after, "things began to get bad" as he represented to the FBI. The situation had deteriorated and devolved into violence well before Verdun's final departure. He chose to remain and only left after police forcefully removed him from the building a second time.

Accordingly, his behavior was deliberate. Verdun was not a rioter who made a bad decision, reconsidered his actions, and left the Capitol. Therefore, the nature and circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Verdun's History and Characteristics

Verdun is 65 years old and is employed with GIS Engineering, LLC in Baton Rouge, Louisiana where he designs piping system. PSR ¶ 56. Verdun is one of nine siblings and was raised

in a working-class home in Louisiana. PSR ¶ 36 – 37. Verdun reports a stable lifestyle and strong familial support system. PSR ¶ 38 – 43, 56, 63. Verdun has no criminal history. PSR ¶ 29. While Verdun does not have a criminal history, there is nothing in his background that would explain why he behaved this way, nor that justifies, excuses, or mitigates his conduct. And as opposed to many crimes generally, the criminal offenses of January 6 were not crimes of passion, desperation, or opportunity: they were ideologically motivated crimes. In these circumstances, the absence of a criminal background does not lessen Verdun's propensity to commit this type of offense again, should similar circumstances present themselves.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While Verdun has no prior criminal history, his actions on January 6 call for a sentence necessary to deter him from future misconduct. The lack of mitigating factors in Verdun's background that could have contributed to his decision making on January 6, 2021, make his conduct particularly concerning. Verdun knew that he was not permitted to be on Capitol grounds, but he chose to enter the Building – not once, but twice.

Verdun entered the Capitol notwithstanding the altercations he observed between rioters and police at the Capitol. Instead, he entered the Capitol and walked deeper into the Capitol with other rioters.

After he returned to the Senate Wing, officers were expelling the mob out of the building, and Verdun exited through a shattered window. Despite all these cues, Verdun did not leave. Instead, after he departed the Capitol for the first time, Verdun remained on the Upper West Terrace. By his own words, he observed "the police pushing the crowd back" and acknowledged

11

during an interview with the FBI that "things began to get bad." While Verdun was on the Upper West Terrace, other rioters violently beached a fire door near the parliamentarian's office. Verdun again made another decision to enter the Capitol a second time knowing he was not permitted to enter the Capitol. After he entered the Capitol through the Fire Door, Verdun did not voluntarily depart. Officers used force in the Brumidi corridor to push Verdun and other rioters out of the Capitol. Verdun had multiple opportunities to leave but chose to stay, warranting a sentence worthy of deterring Verdun from participating in such an event in the future.

Verdun's FBI interview also exposes the need for specific deterrence. While Verdun acknowledged entering the building, Verdun did not wholeheartedly condemn his actions. Instead, he attempted to explain away his actions by stating that he, "followed the crowd" into the Capitol from the rally, conveniently disregarding everything he observed and the additional context for his initial entry. He dismissed his intent when he stated he, "should not have went in if he knew what was going to happen." Verdun knew quite well what was occurring around him as he flooded up Capitol grounds to the Upper West Terrace with an onslaught of other rioters. And, once inside the building, Verdun represented that, "police allowed Verdun and others to walk around inside the Capitol." These statements do not express genuine contrition. Instead, they belie Verdun's attempts to excuse his actions, necessitating a sentence to deter similar conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Verdun based on his own

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Verdun has pleaded guilty to both Counts of the Information, charging him with disorderly or disruptive conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count One) and parading, demonstrating, or picketing in any Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 2). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mark Nealy,* 23-cr-278 (TSC), Judge Chutkan sentenced Nealy to the government's recommendation of 14 days incarceration after Nealy pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Nealy and Verdun's initial movements through the Capitol were nearly identical. Nealy, like Verdun, approached the Capitol from the West Front where he witnessed violence, including rioters breaking windows. Nealy and Verdun both entered the Capitol at

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

roughly 2:25 p.m. through the Senate Wing Door, minutes after the initial breach of this entryway. At this time, the windows along the Senate Wing were broken, the doors were breached, and alarms were blaring. Nealy moved to the Crypt and remained in the Capitol for approximately 13 minutes before exiting the Senate Wing Door at approximately 2:38 p.m., roughly three minutes after officers expelled Verdun from this location. However, Nealy, unlike Verdun, did not enter the Capitol a second time, a notable and aggravating distinction.

*United Sates v. Carson Lucard*, 22-cr-87 (BAH), offers this Court another factual comparator for a rioter who entered the Capitol after initially leaving. Judge Howell sentenced Lucard to 60 days home detention and 21 days intermittent confinement (7 days at a time) after Lucard pled guilty to 40 U.S.C. § 5104(e)(2)(G). Lucard also entered the Capitol along the Senate Wing as he climbed through a shattered window minutes after rioters breached the Capitol at this location. Lucard initially departed the Capitol roughly 15 minutes after he entered. However, after observing the riot, Lucard, like Verdun, entered the Capitol a second time a few minutes after departing. Lucard traveled to the office of Senator Jeff Merkley and remained in the Capitol for approximately 8 minutes before leaving, spending a total of 23 minutes inside the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Verdun must pay $500 in restitution, which reflects in part the role Verdun played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Verdun's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 94.

## V. Fine

Verdun's convictions for violations of 40 U.S.C. 5104(e)(2)(D) and 40 U.S.C. 5104(e)(2)(G) subject him to a statutory maximum fine of $5,000 for Count 1 and $5,000 for Count 2. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Verdun's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where Verdun establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Verdun to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Verdun has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Verdun to 21 days' incarceration on

Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, a fine the Court deems appropriate, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence promotes respect for the law and deters future crime by imposing restrictions on Verdun's liberty because of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Eli J. Ross*
        Eli J. Ross
        Assistant United States Attorney
        Illinois Bar Number 6321411
        United States Attorney's Office
        601 D. Street, N.W.
        Washington, D.C.  20001
        Telephone: (202) 297-1515
        Email: Eli.Ross@usdoj.gov